O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| LETICIA MONTOYA ZEPEDA, | No. CV 16-07413-SJO (DFM) |
| Petitioner, | Final Report and Recommendation of United States Magistrate Judge |
| v. | |
| DARYL ADAMS, Warden, | |
| Respondent. | |

This Amended Report and Recommendation is submitted to the Honorable S. James Otero, United States District Judge, under 28 U.S.C. § 636 and General Order 05-07 of the United States District Court for the Central District of California.[1]

---

[1] The Court issued its original Report and Recommendation on September 25, 2017. Dkt. 15. Petitioner filed objections. See Dkt. 16. The Court now withdraws the original Report and Recommendation and issues this Final Report and Recommendation. Because the Court's recommendation is entirely unchanged, the parties have not been given an opportunity to file additional objections.

# I.

# BACKGROUND

## A.   Procedural History

On June 6, 2012, after a joint trial with her codefendant, Sergio Flores, a jury convicted Leticia Montoya Zepeda ("Petitioner") of first-degree murder and shooting from a motor vehicle. 2 Clerk's Transcript ("CT") 343, 345. It also found true gun and gang enhancements. 2 CT 343-45. The trial court sentenced Petitioner to 51 years to life. 2 CT 368.

Petitioner appealed her conviction to the California Court of Appeal, challenging the natural and probable consequences jury instruction in light of People v. Chiu, 59 Cal. 4th 155 (2014). LD 16 at 20. On January 7, 2015, the California Court of Appeal modified the judgment to reflect certain custody credits and affirmed the judgment as modified. LD 16 at 1-2. On April 15, 2015, the California Supreme Court summarily denied Petitioner's petition for review. LD 19. On October 5, 2015, the United States Supreme Court denied her petition for writ of certiorari. LD 20. On July 26, 2016, the Los Angeles County Superior Court denied Petitioner's habeas petition in an order that did not specifically address her claim of instructional error. LD 22.

Petitioner filed the instant Petition on October 4, 2016, raising her natural-and-probable-consequences instructional-error claim. Dkt. 1 ("Petition"). Respondent filed an answer on December 12, 2016. Dkt. 11 ("Answer"). Petitioner filed a traverse on January 27, 2017. Dkt. 13 ("Traverse").

## B.   Summary of Evidence Presented at Trial

The underlying facts are taken from the California Court of Appeal opinion. LD 16 at 2-7. Unless rebutted by clear and convincing evidence, these facts may be presumed correct. Tilcock v. Budge, 538 F.3d 1138, 1141 (9th Cir. 2008); 28 U.S.C. § 2254(e)(1). Petitioner has not attempted to overcome

2

the presumption with respect to the underlying events.

At about 2:00 a.m. on December 28, 2008, Kevin Montenegro, Nick Perez, and Abraham Guerrero were standing outside Guerrero's house on Correnti Street in Pacoima. A white car drove by the house, made a U-turn, and returned with its headlights off. A rifle was protruding from the front passenger window. The car stopped and the front passenger asked the men where they were from. Perez replied, "We are not from anywhere." Perez grabbed the barrel of the rifle and tried to wrestle it away. Three or four shots were fired, and Perez let go of the barrel. Guerrero was shot in the arm and chest, and died from his injuries.

. . . .

[Montenegro and Perez participated in both live and photographic lineups.] Montenegro testified on cross-examination that Flores was the only individual who had appeared in both the photographic and live lineups. The eyewitness identifications of Flores were buttressed by testimony of an informant, Jose Andalon, the purported shot-caller for the Pacoima Southside Locos (PSSL) gang. Andalon testified against both defendants in this case, in exchange for dismissal of numerous charges and a favorable sentence in his unrelated burglary case. Both juries were informed of Andalon's criminal background and plea agreement.

A. Andalon's Testimony

Andalon testified that he was a founding member of the Little Pacoima gang, which became affiliated with the PSSL gang (jointly, the PSSL gang). Andalon claimed to be the PSSL gang's shot caller (i.e., the person who decides what crimes to commit)

3

when this shooting occurred. He identified [Petitioner] and Flores as members of that gang, and said he loved [Petitioner]—a trusted member of the gang—like a sister.

The PSSL's rival gang is the Pacoima Van Nuys Boys (PVNB) gang and its clique, Anybody Killer (ABK). Two months before the shooting in this case, Flores told Andalon that he had stabbed a PVNB gang member who was chasing him, that other PVNB gang members had followed him home, written on his wall, and were looking for him. One month before the shooting in this case, Andalon gave Flores a rifle. In early December 2008, PVNB members shot several PSSL members on Wingo Street. The shooting in this case occurred on December 28, 2008, a few weeks after the shooting on Wingo Street.

Hours after the shooting in this case, Flores called Andalon and said, "I smoked the fools," meaning he had killed a rival gang member. Flores told Andalon that after he learned that PVNB or ABK gang members were outside on Correnti Street, they went in Vital Gomez's car (Gomez is a PSSL gang member)[FN4] to Correnti Street where some people were standing outside. Flores asked where they were from, then fired the gun until the clip was empty. The deceased victim, Guerrero, was wearing a hat with the letter "A," which is the insignia of the ABK gang. Flores said that he had gotten back for what they had done to him.

[FN5] After the shooting in this case, police searched Gomez's car, a white Chevy Malibu, and recovered a .22 caliber long rifle bullet. The bullet was consistent with the bullet fragment recovered from Guerrero's body.

After receiving this news, Andalon immediately called

[Petitioner] at her workplace to say, "what the fuck happened?"
[Petitioner] said she could not talk on her work phone, so Andalon
called her back on her cell phone. [Petitioner] told Andalon that
while she and Flores were "getting high on PCP," they discussed
the shooting on Wingo Street and the incident where Flores got
"jumped." They both felt they had to do something, and they
walked to Flores's house where Flores retrieved the rifle. They
walked back to [Petitioner's] house, carrying the rifle between
them "like they were a couple, hugging." When they arrived at her
house, they learned that PVNB or ABK gang members "were
hanging out outside on Correnti." [Petitioner] took Gomez's car
keys and drove Flores, who was in the front seat, and Jose
Euyoque (known as Gordo), who was in the back seat, to Correnti
Street. [Petitioner] made a U-turn, turned off the headlights, and
drove up to a group of people in front of a house. Flores "got out,
told them where they were from. Before he even answered, he
pulled trigger and shot them." On the way home, [Petitioner]
damaged Gomez's car by hitting a curb.

Andalon told [Petitioner] that she "didn't need to do that
shit." [Petitioner] replied that she knew what she was doing and
was a grown woman.

Later that day, Flores gave Andalon more details about the
shooting. Flores said that he and [Petitioner] "were getting high,"
they "walked from his house" with the "gun between them," and
they learned "that the Van Nuys Boys or ABK were outside on
Correnti, which is where they hang out at." They drove to
Correnti Street in Gomez's car, and saw some people outside.
Flores "pulled the trigger. He said he didn't know the gun was

5

automatic," and he fired until "the whole clip went out."

Andalon testified that he was in charge of the gang when the shooting occurred, but denied ordering the shooting. The gang had agreed to keep the shooting a secret after learning that Guerrero, the victim, was a "police explorer" and "it was a big deal." Andalon claimed that because he had snitched on defendants, there was a "hit" on his life, and his family members would have to relocate.

B. [Petitioner's] Custodial Statement to Police

When [Petitioner] was arrested and interviewed about this shooting, she gave a taped statement that was played at trial for her jury only.

During the interview, [Petitioner] stated that on the night of the shooting, Gomez, Gordo, Flores, and three girls had been at her house. She walked with Flores to his house and waited outside while he went inside to get money. They then walked back to [Petitioner's] house. [Petitioner] drove Gordo and Flores in Gomez's car to buy some beer. Flores was in the front passenger seat. She did not see a gun. Flores said that he wanted to find "Ducky," and told her where to turn. ("Ducky" was a member of ABK and lived in PSSL territory.) When [Petitioner] turned onto Correnti Street, she saw a group of men. Flores exchanged words with someone. Multiple gunshots were fired from the passenger's side of the car. She drove away and damaged the car while returning home.

When they returned to her house, [Petitioner] asked Gordo and Flores "what the fuck" happened. Gordo stated, "You let him have it," and Flores answered, "Yeah, it got stuck." Flores told

6

Gordo that the victim was not Ducky. Flores gave Gordo the gun so he could get rid of it. Later, they had a meeting at which Gordo told everyone to keep quiet about the shooting. [Petitioner] said that she was worried about people thinking she was a snitch, but she was "not going to go down for this shit."

. . . .

D. [Petitioner's] Defense Evidence

[Petitioner] presented evidence that she had tested negative for drugs on 24 occasions between February 2008 and February 2009. However, she did not test for drugs between December 25 and 30, 2008.

[Petitioner's] employer, Rogelio Flores, testified that in December 2008, [Petitioner] was working for a graffiti removal organization. [Petitioner's] coworker, Otto Portillo, testified that [Petitioner] had asked him to remove PSSL graffiti in Pacoima on many occasions.

As to Andalon's alleged telephone conversation with [Petitioner], the store manager for AT&T in Panorama City—Antonio Alvarado—testified that AT&T did not have a record of a call between phone numbers ending in 7711 and 1228, during the period December 26, 2008, to January 9, 2009. However, because a business may have several routing phone numbers, it was possible that a call made to the 7711 number could have appeared on the statement as a different number.

LD 16 at 2-7.

///

///

///

# II.
## STANDARD OF REVIEW

Petitioner's claims are subject to the provisions of the Antiterrorism and Effective Death Penalty Act ("AEDPA"). Under AEDPA, federal courts may grant habeas relief to a state prisoner "with respect to any claim that was adjudicated on the merits in State court proceedings" only if that adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Overall, AEDPA presents "a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." Burt v. Titlow, — U.S. —, 134 S. Ct. 10, 16 (2013). AEDPA presents a difficult to meet and highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt. Cullen v. Pinholster, 563 U.S. 170, 180 (2011). The prisoner bears the burden to show that the state-court's decision "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington v. Richter, 562 U.S. 86, 103 (2011). In other words, a state-court determination that a claim lacks merit precludes federal habeas relief so long as "fairminded jurists could disagree" on the correctness of that ruling. Id. at 101 (citation omitted). Federal habeas corpus review therefore serves as "'a guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." Id. at 102-03 (citation omitted).

Here, Petitioner raised her claim on direct appeal to the California Court of Appeal, which rejected her claim in a reasoned opinion. LD 16. She brought a petition for review to the California Supreme Court, which summarily denied it. LD 19. Finally, she filed a habeas petition in the Los Angeles County Superior Court, which denied Petitioner's habeas petition in an order that did not specifically address her claim. LD 22. Rather, the Superior Court found that "[e]ven assuming the facts alleged in the petition are true, [P]etitioner fails to allege facts establishing a prima facie case for habeas relief" or "demonstrating entitlement to the relief requested." LD 22 at 1-2.

The Superior Court's denial of habeas relief cannot properly be considered a reasoned decision, since it states only that Petitioner failed to state a prima facie case for relief. See Godoy v. Spearman, 861 F.3d 956, 961 n.1, 962 (9th Cir. 2017) (en banc) (using California Court of Appeal's decision on direct review as last reasoned decision rather than its subsequent denial of petitioner's habeas petition when "[t]he court of appeal denied the petition, saying only that [petitioner] 'fail[ed] to state a prima facie case for relief'"); see also Pinholster, 563 U.S. at 188 n.12 (equating a state court's determination that "the claims made in th[e] petition do not state a prima facie case entitling the petitioner to relief" with a summary denial on the merits (internal citation omitted)). Accordingly, under the "look through" doctrine, Petitioner's claim of instructional error is deemed to have been rejected for the reasons given in the last reasoned decision on the merits, which was the California Court of Appeal's decision rejecting Petitioner's direct appeal. See Ylst v. Nunnemaker, 501 U.S. 797, 804 n.3 (1991).

///
///
///
///

9

**III.**

**DISCUSSION**

**A.** **Petitioner's Claim of Instructional Error**

Petitioner argues that the California Court of Appeal's decision that the natural and probable consequences jury instruction was harmless beyond a reasonable doubt was contrary to clearly established United States Supreme Court authority. Petition at 7.

**1.** **Applicable Law**

"In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." Estelle v. McGuire, 502 U.S. 62, 68 (1991); Swarthout v. Cooke, 562 U.S. 216, 219 (2011) (per curiam) ("We have stated many times that federal habeas corpus relief does not lie for errors of state law.") (quoting McGuire, 502 U.S. at 67). The issue of whether a jury instruction violated state law generally is not a federal question or a proper subject for habeas corpus relief. McGuire, 502 U.S. at 71-72. Thus, to show a violation of due process, the petitioner must demonstrate that the ailing instruction by itself so infected the entire trial that the resulting conviction was fundamentally unfair. Id. at 72. The challenged jury instructions "'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record." Id. (citation omitted).

Under clearly established United States Supreme Court precedent, an instructional error that allows the jury to convict the defendant under either a valid or an invalid legal theory is an error of constitutional magnitude. See Hedgpeth v. Pulido, 555 U.S. 57, 58 (2008) (per curiam) ("A conviction based on a general verdict is subject to challenge if the jury was instructed on alternative theories of guilt and may have relied on an invalid one."). Yet even where an instruction was in error, a petitioner can only obtain relief if the

unconstitutional instruction had a substantial and injurious effect or influence on the jury's verdict and thereby resulted in actual prejudice. Brecht v. Abrahamson, 507 U.S. 619, 637-38 (1993); see also Fry v. Pliler, 551 U.S. 112, 121-22 (2007) (holding that the Brecht standard applies uniformly in all federal habeas corpus cases under § 2254). And because Brecht incorporates the requirements of AEDPA, if a state court has determined that a trial error was harmless, then "a federal court may not award habeas relief under § 2254 unless the harmlessness determination itself was unreasonable." Davis v. Ayala, 135 S. Ct. 2187, 2199 (2015) (citing Fry, 551 U.S. at 119) (emphasis in original).

**2.      Relevant Facts**

At trial, the prosecution presented two first-degree murder theories: (1) willful, deliberate, and premeditated murder and (2) murder committed by shooting a firearm from a motor vehicle. 11 Reporter's Transcript ("RT") 1412-13. The prosecution told the jury that it could find Petitioner guilty of murder as an aider and abettor either as a direct aider and abettor or under the natural and probable consequences doctrine. 11 RT 1415. The natural and probable consequences instruction stated:

> To prove that the defendant is guilty of murder, the People must
> prove that: 1. The defendant is guilty of Assault with a deadly
> weapon; 2. During the commission of Assault with a deadly
> weapon a coparticipant in the Assault with a deadly weapon
> committed the crime of murder; [and] 3. Under all of the
> circumstances, a reasonable person in the defendant's position
> would have known that the commission of the murder was a
> natural and probable consequence of the commission of the
> Assault with a deadly weapon.

2 CT 334.

While the case was pending before the state appellate court, the California Supreme Court issued People v. Chiu, 59 Cal. 4th 155 (2014), which held that a defendant cannot be convicted of first-degree murder as an aider and abettor under the natural and probable consequences doctrine.

Taking Chiu into account, the Court of Appeal found "that the natural and probable consequences instruction should not have been given to [Petitioner's] jury." LD 16 at 20. Thus, it focused on "whether the error was prejudicial," and concluded that the legally-incorrect instruction was harmless error. Id. at 22. The state appellate court noted that the jury found Petitioner guilty of both first-degree murder and knowingly permitting Flores, the shooter, to fire from the vehicle that Petitioner was driving. Id. at 21-22. Thus, it determined that the jury must have concluded that Petitioner shared Flores's intent to commit a drive-by shooting and found Petitioner guilty as a direct aider and abettor rather than as a natural and probable consequence of assault with a deadly weapon. Id. at 20-21. Further, the Court of Appeal determined that the jury likely believed Andalon's testimony that Petitioner actively planned and prepared to kill a rival gang member with Flores and found their actions and mental states identical. Id. at 20-22. It therefore concluded that "the instructional error was harmless." Id.

### 3. Analysis

The Court will assume that the natural and probable consequences jury instruction was erroneous and proceed to consider whether the erroneous instruction had a substantial and injurious effect on the jury's verdict under Brecht. See Reyes v. Mongtomery, No. 15-4644, 2016 WL 4536411, at *8-9 (C.D. Cal. June 28, 2016); see also Hedgpeth, 555 U.S. at 58 (holding that court must apply Brecht where jury is instructed on multiple theories of guilt and one theory is legally incorrect). Because the state appellate court applied Chapman v. California, 386 U.S. 18 (2010), when reaching its conclusion, its

holding is reviewed for reasonableness under § 2254(d). <u>See</u> LD 16 at 22; <u>Ayala</u>, 135 S. Ct. at 2198; <u>Mitchell v. Esparza</u>, 540 U.S. 12, 18 (2003) (per curium).

The state appellate court was not objectively unreasonable in finding that the error was harmless. Its determination that the jury likely believed Andalon's testimony and disbelieved Petitioner's was a reasonable one. Given the evidence available at trial, the jury likely reached its first-degree murder verdict on the legally valid theory that Petitioner directly aided and abetted a premeditated murder.

Petitioner suggests that when the jury found her guilty of knowingly permitting Flores to fire from the vehicle that Petitioner was driving, it could have found her guilty of aiding and abetting an assault with a firearm, the natural and probable consequence of which was death. Petition at 21-22. She also suggests that the jury could have concluded that Petitioner knew about the gun and Flores's intent to shoot a gang member without helping him get the gun into the car. <u>Id.</u>

Yet the jury heard ample evidence that Petitioner shared Flores's murderous intent and that the two formed that intent with premeditation and deliberation. Andalon testified that Petitioner told him that the two had hidden the gun between them while walking and formulated the plan to shoot a rival gang member as revenge while high on PCP. 1 CT 94-96. And after Flores shot Guerrero, Petitioner drove off so quickly that she damaged the car she was driving, suggesting that she was prepared to flee after a premeditated murder. 1 CT 95.

Petitioner points to the evidence that she passed many drug tests that year and the absence of any record showing Andalon's alleged call to her work phone. <u>See</u> Traverse at 24-25. But the jury had this information when making its decision. 1 CT 117; 11 RT 1463. Its finding of guilt for knowingly allowing

13

Flores to shoot from the car suggests that it did not find Petitioner's evidence compelling.

Nothing in the record suggests that the jury relied on the natural and probable consequences doctrine rather than a theory of direct aiding and abetting. See Romero v. Warden, No. 14-488, 2017 WL 1197858, at *8 (C.D. Cal. Feb. 14, 2017) (denying relief where "the record does not indicate that the jury relied on the natural and probable consequences doctrine as distinguished from a theory of direct aiding and abetting"), accepted by 2017 WL 1197663 (C.D. Cal. Mar. 29, 2017). Rather, the jury's finding that Petitioner knowingly allowed Flores to shoot from the car that she was driving, combined with the evidence presented at trial, makes it improbable that the jury would have reached a different result if it had not been instructed on the natural and probable consequences doctrine. See Neder v. United States, 527 U.S. 1, 17 (1999) (finding erroneous instruction omitting element of offense harmless because the verdict was "supported by overwhelming evidence, such that the jury verdict would have been the same absent the error"); see also Waddington v. Sarausad, 555 U.S. 179, 193-94 (2009) (finding that "[g]iven the strength of the evidence supporting the conviction . . . it was not objectively unreasonable for the [state] courts to conclude that the jury convicted" petitioner under correct theory despite potentially ambiguous instruction).

Petitioner has failed to show that the error had a substantially injurious effect or influence in determining the jury's verdict under Brecht. The California Court of Appeal's decision was not contrary to, or an unreasonable application of, clearly established federal law and was not based on an unreasonable determination of the facts. Petitioner is not entitled to relief on her claim.

///

///

14

**B.** **Requests for Appointment of Counsel and an Evidentiary Hearing**

Petitioner requests the appointment of counsel and an evidentiary hearing. Petition at 7.

There is no constitutional right to counsel in connection with a habeas petition. Bonin v. Vasquez, 999 F.2d 425, 429 (9th Cir. 1993). The decision of whether to appoint counsel for Petitioner is within the Court's discretion. In deciding Petitioner's request, the Court evaluates both Petitioner's likelihood of success on the merits and her ability to articulate her claims pro se in light of the complexity of the legal issues involved. Weygandt v. Look, 718 F.2d 952, 954 (9th Cir. 1983). Here, Petitioner has shown the ability to articulate her claim without counsel. And nothing in her request or argument suggests otherwise. Thus, appointment of counsel is not warranted.

Furthermore, an evidentiary hearing is not required on issues that can be resolved by reference to the state-court record under § 2254(d), as Petitioner's claims can be. Pinholster, 563 U.S. at 183 ("[W]hen the state-court record 'precludes habeas relief' under the limitations of § 2254(d), a district court is 'not required to hold an evidentiary hearing.'" (quoting Schriro v. Landrigan, 550 U.S. 465, 474 (2007))).

///
///
///
///
///
///
///
///
///
///

15

# IV.

## CONCLUSION

IT IS THEREFORE RECOMMENDED that the District Court issue an Order: (1) accepting this Final Report and Recommendation and (2) directing that Judgment be entered denying the Petition, denying Petitioner's requests for an evidentiary hearing and appointment of counsel, and dismissing this action with prejudice.

Dated:  October 31, 2017

_____
DOUGLAS F. McCORMICK
United States Magistrate Judge